Gen. 151]                                                                                          151

**GAMING**

**REFERENDA – METHODS BY WHICH A STATEWIDE OR LOCAL VOTE COULD PRECEDE INITIATION OF COMMERCIAL GAMBLING**

November 15, 1995

*The Honorable Joseph D. Tydings, Chairman*
*Joint Executive-Legislative Task Force to Study*
*Commercial Gaming Activities in Maryland*

You have requested our opinion on two topics: whether legislation authorizing commercial gambling in Maryland could be made contingent upon, or be subject to, popular referendum; and whether such a measure could delegate to a local jurisdiction, subject to certain State regulatory parameters, the final decision on whether to allow commercial gambling in that locality.

Our opinion is as follows:

1.      The General Assembly has the discretion to authorize commercial gambling by means of  a constitutional amendment. Were it to do so, the amendment would necessarily be submitted to the statewide electorate for approval.

2.      A single piece of legislation, or a package of bills enacted at a single session, for the purpose of authorizing, regulating, and taxing commercial gambling, with the tax proceeds devoted to various public purposes, is probably exempt from petition to statewide referendum under Article XVI, §2 of the Maryland Constitution.

3.      If the General Assembly chose to enact legislation simply authorizing and regulating commercial gambling, *without* taxing and related fiscal measures, that legislation could be petitioned to statewide referendum.  Non-referable tax and funding provisions could be enacted at a subsequent session.

4.      Legislation      authorizing,      regulating,      and      taxing commercial gambling, whether throughout the State or in particular jurisdictions, would constitute a public general law that, under the

Constitution, cannot be conditioned on a statewide or local referendum.

5. Legislation authorizing commercial gambling, either throughout the State or in one or more jurisdictions, may have its effectiveness in a specific jurisdiction conditioned on the enactment of a local ordinance sanctioning such gaming within the locality.

6. Legislation described in Paragraph (5) above, conditioning the local effectiveness of commercial gambling on enactment of a local ordinance, can contain provisions to facilitate the petitioning of such an ordinance to a local vote.[1]


# I

## Commercial Gambling Legislation

To respond to your questions without an actual bill in hand, we must make certain assumptions about its likely features. The first reader version of House Bill 995, which was amended to create the Joint Executive-Legislative Task Force to Study Commercial Gaming Activities in Maryland (Chapter 579, Laws of 1995), contains the likely elements of such a measure. It would have established a State regulatory and licensing agency to license and police gambling establishments. This agency would also have collected fees from the establishments and could have civilly fined them for infractions.

The bill also would have authorized a State admissions and amusement tax on the gross receipts derived from regulated gambling activity. These tax proceeds, which were estimated at up to $50 million, *see* Fiscal Note on House Bill 995 (March 2, 1995), would have been distributed to the counties and to components of the Department of Health and Mental Hygiene.

---

[1] This opinion was originally issued as a letter of advice. Because of the importance of the issues discussed, we have reissued the letter, after slight editing, as an opinion.

## II

### Constitutional Amendment

One way to ensure a statewide vote before commercial gambling could be undertaken is by the General Assembly's embodiment of its approval in a constitutional amendment. Under Article XIV, §1, all amendments affecting more than one county must be submitted to the voters statewide.[2] To be sure, it would be unprecedented to include such detail in a constitutional amendment to be submitted to Maryland voters. However, there are few, if any, restrictions on what may be included in a state constitution.

In my opinion, it would be possible for the General Assembly to propose a constitutional amendment expressly "authorizing" commercial gambling at casinos with separate legislation, akin to the first reader version of House Bill 995, made contingent upon voter approval of the amendment. *See* Chapters 364 and 365 of the Laws of Maryland 1972, amending the Constitution to sanction State-run lotteries. It also would be possible to amend the Constitution to require a referendum before any commercial gambling measure could take effect.

## III

### Referendum Under Article XVI

Article XVI of the Maryland Constitution generally authorizes voters to petition to referendum most enactments of the General Assembly. However, Article XVI, §2 expressly exempts from this petition process a law "making any appropriation for maintaining the State Government." In *Kelly v. Marylanders for Sports Sanity*, 310 Md. 437, 530 A.2d 245 (1987), the Court of Appeals concluded that this language exempted from referendum three bills that together authorized the construction of sports stadiums and their financing via bond issues and sports lotteries. The Court found that this package was a revenue-raising and spending measure in furtherance of public recreational purposes and thus was exempt from voter consideration,

---

[2] For the reasons explained in Part IV below, even if commercial gambling were limited to a single jurisdiction, the regulatory and fiscal impact would affect more than that jurisdiction.

although other portions of the legislation, considered in isolation, would have been subject to referendum.  310 Md. at 461, 467, and 468.

In our view, commercial gambling legislation like House Bill 995 would similarly be exempt from referendum by petition. Whatever one might say about the effects of such a bill as a whole, in the short run it would be a revenue-raiser, and the objects of the tax – promotion of public health and aid to local governments – are public purposes that would be considered as "maintaining ... the State Government."[3]

Because a key holding in the stadium litigation was that the "appropriation" portion of the legislative package was legally inseparable from non-exempt portions, we have considered whether a commercial gambling measure might be split into a referendum-exempt "appropriation" component and a non-exempt regulatory/licensing component, each with an express severability clause.  In our opinion, it is doubtful that such a device, if enacted at a single session, would achieve the effect of permitting the petitioning of the regulatory/licensing bill.  A severability clause does not bind a court to find severability. *See State v. Schuller*, 280 Md. 305, 319, 372 A.2d 1076 (1977).  Thus, "even if the actual intention of the Legislature were to sever," a court would conclude otherwise if it found that the bills were not independent, *see Board of Public Works v. Baltimore County*, 288 Md. 678, 684, 421 A.2d 588 (1980) – a likely conclusion in the case of a subdivided House Bill 995.

An alternative would be the enactment at one session of a regulatory/licensing bill without any revenue-raising or appropriation component.  The General Assembly could await the likely petitioning of such a measure to referendum and, if it were approved by the voters, enact a revenue-raising/appropriation bill at the following session.  Although we have found no case law considering such an enactment, we believe that this approach would be constitutionally permissible.

---

[3] We would reach the same conclusion if the tax proceeds were earmarked for the General Fund and thereafter appropriated via the budget bill for general governmental purposes.

## IV

## Mandatory Referendum

It has long been the law of Maryland that the General Assembly may not enact a public general law contingent upon a referendum of the people, either on a statewide or local level, although a public local law may be conditioned on a referendum of those in the affected area. *See Board of Public Works v. Baltimore County*, 288 Md. at 681 (collecting cases). The rationale for this constitutional rule was set forth in *Brawner v. Supervisors*, 141 Md. 586, 595, 119 A. 250 (1922):

> [W]e rest our conclusion upon two grounds, one, that the people of Maryland, having delegated to the legislature of Maryland the power of making its laws, that body could not legally or validly redelegate the power and the authority thus conferred upon it to the people themselves; and two, that people of the State, from whom the Legislature itself derives its powers, having prescribed in the Constitution of the State the manner in which its laws shall be enacted, it is not competent for the Legislature to prescribe any other or different way in which its laws may be enacted.

Commercial gambling legislation akin to the regulatory, taxing, and funding measures in House Bill 995, whether authorizing casinos statewide or in only one or a handful of jurisdictions, would, in our view, be a public general law. As such, it could not be conditioned on either a statewide or a local vote.

A somewhat closer question is whether such a public general law might nevertheless contain a "local option" mechanism — that is, a requirement for a local vote approving commercial gambling within the particular locality before the law could take effect there. It might be argued that support for such an approach is found in cases such as *Burgess v. Pue*, 2 Gill 12 (1844) and *Fell v. State*, 42 Md. 71 (1875).[4] In *Burgess v. Pue*, the Court of Appeals rejected a

---

[4] In a March 4, 1992 letter of advice to the Honorable Ellen R. Sauerbrey, this office concluded that these cases would permit the General

constitutional attack on Chapter 162 of the Laws of 1825, a public general law that authorized a system of primary school instruction throughout the State, included local taxing authority exercised by the inhabitants of the school district, and contained a contingency submitting the act to the vote of the people of each county to determine its effectiveness within each county's boundaries.[5] In *Fell v. State*, 42 Md. 71 (1875), the Court of Appeals rejected an antidelegation attack on a General Assembly enactment that authorized the voters of four counties to determine whether certain alcoholic beverage laws would apply to their locality. In so doing, the Court rejected the contention that the enactment was not a complete law in itself but was made to depend for its existence and operation on a popular vote. 42 Md. at 92.[6]

However, the premise of both cases is that the "local option" feature of the challenged legislation was a public local law. *See Cole v. Secretary of State*, 249 Md. at 434. *Cole* distinguishes these statutes from single-county measures whose immediate object appeared local in character but which "indirectly affected matters of significant interest to the entire State," such as the "protection of State revenues derived from licenses." 249 Md. at 435.[7]

---

Assembly, in a statewide bill, to condition on a local vote the effectiveness within a subdivision of a local "piggyback tax" increase.

[5] Although it is possible to contend that *Burgess* did not involve a challenge premised on an unconstitutional delegation of power to the voters, *see Hammond v. Haines*, 25 Md. 541, 560 (1866), later cases have treated it as resolving such a claim. *See, e.g., Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272 (1968).

[6] There was little discussion in the Court's opinion of the fact that the legislation impacted more than one county. Rather, the focus of the Court was on the law's operation within a single county. 42 Md. at 87.

[7] On this point, *Cole* cited *Gaither v. Jackson*, 147 Md. 655, 128 A. 769 (1925), which concluded that a Baltimore City law licensing auctioneers was a public general law, and *Dash v. Jackson*, 270 Md. 251, 183 A. 534 (1936), which reached a similar conclusion regarding a State law licensing paperhangers in Baltimore City. *Gaither* noted that the statute was not a local law "because it provided revenue for the whole State," 147 Md. at 667, and *Dash* concluded that the paperhanging statute was a general law "because it affects the general revenues of the State." 170 Md. at 261. While neither case involved a mandatory referendum, they have been cited and relied upon in such cases. *See, e.g., Steimel v.*

In our opinion, commercial gambling legislation falls clearly on the "significant State interest" side of the line. Aside from the practical impact the licensing of a casino would have on those outside a particular jurisdiction, legislation like House Bill 995 clearly affects a scheme of State licensing and regulation and the provision of State revenues for statewide purposes.[8] The operation of such a law, even within a single locality, cannot be made contingent on a local referendum. To do so would unconstitutionally mandate to referendum public general law.

## V

### Local Ordinance Contingency

Mandating that the effectiveness of commercial gambling legislation within a particular jurisdiction hinge on the enactment of a local ordinance does not raise the same constitutional problem as requiring a vote of the people. In our opinion, such a proposal involves a delegation of power that the courts are likely to uphold.

First, the General Assembly has wide latitude in placing contingencies on the effectiveness of legislation. *See State v. Kirkley*, 29 Md. 85, 102 (1868)*; Baltimore v. Clunet*, 23 Md. 449,

---

*Board*, 278 Md. 1, 6, 357 A.2d 386 (1976).

[8] Neither *Burgess,* in which local voter approval would have triggered *local* taxation and *local* regulation, nor *Fell*, where voter approval would have authorized *local* licensing, is remotely comparable to the statewide impact of House Bill 995. The same conclusion is true of the proposed "piggyback tax" referendum approved in the March 4, 1992 letter of advice to Delegate Sauerbrey.

469-70 (1865).   And my office has previously approved the constitutionality of legislation whose effectiveness was conditioned on certain findings of Executive Branch officers.  *See* letter of advice on House Bill 651 (March 25, 1986);  letter of advice on House Bill 398 (March 16, 1987).  We do not see why a different result should be warranted with respect to conditioning effectiveness of State law on approval by a political subdivision through enactment of an ordinance.  It raises no separation of powers concerns.  *See County Council v. Investors Funding*, 270 Md. 403, 436, 312 A.2d 225 (1973).  In addition, the counties are arms and agents of the State. *See Baltimore County v. Churchill, Ltd.,* 271 Md. 1, 7, 313 A.2d 829 (1974).  Finally, virtually any delegation of legislative power may be constitutionally justified if an appropriate standard governs the discretion of the recipient of the delegation.  *See Montgomery County v. Walsh*, 274 Md. 502, 523-24, 336 A.2d 97 (1975).[9]  Any reasonable standard would ensure that a local option by local ordinance would raise no question of unconstitutional delegation of power.

## VI

### Petition of Local Ordinance

In our opinion, a local option ordinance described above may be petitioned to referendum without offending any constitutional requirement, and State law may facilitate such a voluntary referendum.  *See* Letter of Advice on Senate Bill 356 and Senate Bill 836 (March 22, 1990) (legislative contingency facilitating referendum by petition of alternative abortion law changes is constitutional because "it is up to the citizens of Maryland to initiate" the process.)

A referendum by petition is "not a power to enact the law itself," *Cheeks v. Cedlair Corporation*, 287 Md. 595, 612, 415 A.2d

---

[9] There is some authority for the proposition that a law delegating authority to a local legislative body, rather than an executive body, need not contain a standard to govern discretion.  *See* 16 C.J.S. *Constitutional Law* §161.

255 (1980), and is less of an exercise of legislative power by the people than that conferred by mandatory referendum, *see* 63 *Opinions of the Attorney General* 291, 293 (1978). It is also an optional act not within the control of the Legislature or local legislative body. Finally, in the March 4, 1992, letter of advice on a "piggyback tax" local option, this office noted that:

> An alternative method of achieving the same end might be found in a provision that authorizes the locality to impose the tax, but subject to the power of the voters to *petition* the issue to referendum either pursuant to local charter provisions or some state-specified standard. *See, e.g.,* Art. 25A, §5(P)(1)(ii) on referendum of charter county bond issues.

For all of these reasons, we believe that the additional element of a local opportunity to petition a county ordinance on commercial gambling to local referendum is not unconstitutional. We note, however, that care should be taken in drafting any provision on this subject, because not all county voters have the right to petition an ordinance to referendum.[10] Thus, a petition mechanism for subdivisions without referendum must be included within the State legislation.


## VII

### Conclusion

This opinion has reviewed the legality of the various mechanisms by which the issue of commercial gambling might be brought to a vote of the people statewide or locally. Obviously this opinion is not intended as an implicit comment on the policy wisdom of any of these alternatives or of commercial gambling itself. As you know, the Attorney General's Office has expressed strong views on the subject and stands by them, especially our conclusions about the

---

[10] Every charter subdivision has such a general referendum procedure in its charter, except for Baltimore City. Code home rule counties have referendum pursuant to Article 25B, §10(h). Commissioner counties have no general referendum provisions.

dire effect on the crime rate that would be the inevitable result of commercial gambling.  This opinion, however, is limited solely to the legal issues presented.

                                        J. Joseph Curran, Jr.
                                        *Attorney General*

                                        Robert A. Zarnoch
                                        *Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*